## Commonwealth v. Mamula.

*Criminal law—Involuntary manslaughter—Negligence in driving motor-truck—Ordinary care.*

1. Involuntary manslaughter arises where it plainly appears that neither death nor any great bodily harm was intended, but death is accidentally caused by some unlawful act, or any act lawful in itself, but done in an unlawful manner without due caution or circumspection.

2. Failure to use ordinary or reasonable care under the given circumstances is sufficient to constitute the crime of involuntary manslaughter where the negligent act results in the death of another.

3. Under the common law and the law of Pennsylvania, no particular degree of negligence is necessary to make out the crime of involuntary manslaughter where death ensues as the result thereof. Simple negligence is sufficient to sustain a conviction.

4. Malice is not an ingredient of the crime of involuntary manslaughter; its presence raises the degree of the crime above that of involuntary manslaughter.

5. If the driver of an automobile does not exercise ordinary care, and, as a result of his negligence, he kills another, he may be convicted of involuntary manslaughter.

Indictment for involuntary manslaughter. O. and T. Beaver Co., June Sess., 1923, No. 3.

*Louis E. Graham*, District Attorney, and *J. Blaine McGoun*, Assistant District Attorney, for Commonwealth.

*L. M. Sebring*, for defendant.

READER, J., Sept. 15, 1923.—The defendant in this case was tried upon an indictment charging him with the crime of involuntary manslaughter. He was accused of having caused the death of Mrs. Edith Muldowney by bringing his auto-truck into collision with a horse and carriage in which she was

4 D. & C.

riding at the time of the accident. The accident occurred on May 26, 1923, in the Borough of Woodlawn. In the carriage the deceased, Mrs. Muldowney, was riding with her sister, Mrs. Kugel, and three children. They were driving down a street known as Davis Street, which at the scene of the accident descended a hill having quite a steep grade. The defendant drove his truck down the same hill in the rear of the carriage, and in attempting to pass to the right of the carriage came into collision with it, overturning it, throwing out the occupants and running over Mrs. Muldowney and inflicting injuries from which she died on the following day. The jury returned a verdict of guilty as indicted. The case is now before us on a motion for a new trial and a motion in arrest of judgment.

The principal contention of the defendant is that the court erred in stating to the jury that if the defendant failed to use reasonable, ordinary care under the circumstances, and by reason of ordinary negligence on his part in operating his truck at the time occasioned the death of Mrs. Muldowney, they would be justified in convicting him of involuntary manslaughter. This seems to us to be in fact the only question involved in the case. For, while the charge of the court is criticised by counsel for the defendant in certain other respects, we are satisfied that if the court's view of the law upon the question above indicated is correct, the charge is otherwise consistent and adequate.

In charging the jury with reference to what constitutes the crime of involuntary manslaughter, we quoted the definitions of the crime hereinafter set out, and then said to the jury:

"In determining whether the defendant in this case is guilty of involuntary manslaughter, the question is whether he failed to use, under the circumstances surrounding this case, that care and caution and regard for the law which a reasonably careful and prudent man would have used under those circumstances. That is the test and the standard by which his conduct is to be judged. He was not required to use absolute care, or the highest degree of care, but that ordinary care which a reasonably careful and prudent man would use under such circumstances. If in operating his automobile at and immediately before the accident in question he failed to use that ordinary and reasonable care, and if this failure was the cause of the death of this woman, he would be guilty of the crime of involuntary manslaughter, under the definition of that crime as we have given it to you.

"Your duty, therefore, is to carefully examine the evidence in the case to ascertain whether the defendant failed to use reasonable care in operating his truck at the time of the accident, and whether such failure, if there was any failure, caused the death of Mrs. Muldowney."

This instruction was substantially repeated elsewhere in the charge, though possibly in varying language. The question for determination, therefore, is, as it seems to us, whether or not the court was in error in thus instructing the jury as to the degree of negligence requisite to constitute involuntary manslaughter. Counsel for the defendant has furnished the court a very able and thorough brief in support of his contention, in which he has referred to a number of Pennsylvania cases, and also to a great many cases decided in other jurisdictions.

We take up, first, the definition of the crime of involuntary manslaughter at common law, and also under the decisions of our own State. Blackstone, on page 192 of the fourth book of his Commentaries, thus defines the offence: "The second branch, or involuntary manslaughter, differs also from homicide excusable by misadventure in this, that misadventure always happens in

consequence of a lawful act, but this species of manslaughter in consequence of an unlawful one, as, if two persons play at sword and buckler, unless by the king's command, and one of them kills the other, this is manslaughter, because the original act was unlawful; but it is not murder, for the one had no intent to do the other any personal mischief. So where a person does an act lawful in itself, but in an unlawful manner, and without due caution and circumspection, as when a workman flings down a stone or a piece of timber into the street and kills a man, this may be either misadventure, manslaughter or murder, according to the circumstances under which the original act was done. If it were in a country village where few passengers are, and he calls out to all people to have a care, it is misadventure only; but if it were in London, or other populous town, where people are continually passing, it is manslaughter, though he gives loud warning, and murder, if he knows of their passing and gives no warning at all, for then it is malice against all mankind. And, in general, when an involuntary killing happens in consequence of an ulawful act, it will be either murder or manslaughter, according to the nature of the act which occasioned it. If it be in prosecution of a felonious intent, or if its consequences naturally tended to bloodshed, it will be murder; but if no more was intended than a mere civil trespass, it will only amount to manslaughter."

Com. v. Gable, 7 S. & R. 423. In this case the indictment was for murder, and a verdict was returned of not guilty of murder, but guilty of manslaughter. The court held that this was a conviction of voluntary manslaughter, but took occasion in the course of the opinion of Chief Justice Tilghman to define involuntary manslaughter. The court said: "On the contrary, involuntary manslaughter is where it plainly appears that neither death nor any great bodily harm was intended, but death is accidentally caused by some unlawful act, or an act not strictly lawful in itself, but done in an unlawful manner and without due caution. This doctrine is exemplified in the cases put in 4 Bl. Comm., 192, and 1 Hale, 472, 473, such as where two men are playing at an unlawful game, and one of them unintentionally kills the other; or where a workman throws down a stone or piece of timber into the street of a populous city, even though he calls out to give warning; or where one is hunting in the park of another, without license, and his arrow, glancing from a tree, kills another. In all these cases it is evident that neither death nor bodily harm of any kind were intended, yet the acts being either unlawful of themselves, or not done with sufficient caution, they are held to be cases of manslaughter."

Com. v. Bilderback et al., 2 Parsons, 447. In this case the defendants, operating a steamboat on the River Delaware, ran down upon a batteau, also navigating the river, throwing out of it a man, who was drowned. The defendants were charged with homicide. The contention of the Commonwealth was that the defendants were guilty of voluntary manslaughter. The court held that under the indictment the defendants could not be convicted of involuntary manslaughter. The court defined involuntary manslaughter as follows: "Involuntary manslaughter arises where it plainly appears that neither death nor any great bodily harm was intended, but death is accidentally caused by some unlawful act, or an act lawful in itself, but done in an unlawful manner, without due caution and circumspection."

Applying this principle to the facts, after reviewing the facts to some extent, the court said: "It would then seem that the defendants were engaged in a lawful pursuit, and conducting it in a lawful manner. It is now for you to inquire whether, while they were thus employed, did they exercise proper and

4 D. & C.

ordinary caution? While steering the steamboat down the river, did they see the batteau crossing the line of the Edward? Might the pilot have seen it if proper circumspection had been exercised by him? Were the defendants using that care and caution which is generally manifested, and which the law requires should be exercised by those who navigate the stream? If you should think they were, then it would not be proper to adjudge them guilty of a criminal act."

Com. *v.* Kuhn, 1 Pitts. 13. In this case the defendant was indicted for involuntary manslaughter in the Court of Oyer and Terminer of Allegheny County. In charging the jury, McClure, P. J., said:

"Gentlemen: Michael Kuhn, an engineer in the employment of the Pennsylvania Railroad Company, is indicted for involuntary manslaughter, in causing the death of Ezekiel Holton, on the first day of April, 1853, by alleged carelessness in running the locomotive 'Altoona' down Liberty Street, in the City of Pittsburgh. . . .

"Involuntary manslaughter is where a man doing an unlawful act, not amounting to felony, by accident kills another, or where one does a lawful act in an unlawful manner.

"The act of coming down Liberty Street with the locomotive and cars was a lawful act. Was it done in an unlawful manner? That is, was it done with due care and caution, or was it not? Was the defendant careful or careless? If his conduct was marked by due care and caution, under the circumstances, he is not guilty; if not, then he is guilty.

"What is carelessness, and what is due care, are matters of fact that can be determined by a jury in each particular case as it arises; and the degree of care demanded depends on times, places and circumstances, which are the elements of your verdict, and all of which you will judge."

Com. *v.* Long, 17 Pa. Superior Ct. 641. In this case the defendant was indicted for manslaughter and was found guilty of involuntary manslaughter. The defendant shot and killed deceased, who had entered his house in the night-time, while the deceased was running away on the porch of defendant's house, and just as he jumped from the porch. Defendant testified that he shot at deceased's legs to wound him, and that he jumped unexpectedly, the shot taking effect in his back, resulting in his death. The court said in defining the offence: "When a man kills another in an honest error of fact, murder is out of the question. The only issue is, was this error negligent or non-negligent? If negligent, the killing is manslaughter; if non-negligent, excusable homicide: 1 Wh. Crim. L., §§ 492, 467, and cases cited."

Com. *v.* Godshalk, 76 Pa. Superior Ct. 500. In this case the defendant was convicted under an indictment charging him with involuntary manslaughter. He had so driven his automobile as to strike a child and kill her. The conviction was upheld by the Superior Court, which said, among other things:

"There should be no doubt as to the duty of an operator of a motor-vehicle on the public highway. The Act of Assembly of June 30, 1919, P. L. 678, is mandatory in defining the duties of every operator of a motor-vehicle. Section 19 specifically provides that the speed shall not be reckless or at a rate greater than is reasonable and proper, having regard to the width, traffic and use of the highway, or so as not to endanger property or the life or limb of any person. Section 25 provides that the operator shall keep his vehicle as close as possible to the right-hand side of the highway. The dispute between the Commonwealth and the defendant was narrowed to the single proposition that the defendant violated the provisions of this act of assembly, and, as a result of such violation, this little girl was killed.

Commonwealth *v.* Mamula.

"There can be no controvesy as to our decisions in regard to such a case. Reckless driving upon the highway is not the exercise of reasonable or ordinary care in the use of it, and is a failure to perform a duty imposed by law. When an automobile driver sees a child in a place of danger, or has reason to apprehend that it might run into a place of danger, and has sufficient time to stop his car, if under proper control, it is his duty to exercise such care as would be reasonably necessary to avoid a collision."

In addition to the cases above cited, we call attention to the following cases: Com. ex rel. Mengle *v.* The Sheriff, 16 Phila. 518; Com. v. Sheehan, 76 Pa. Superior Ct. 128; Com. *v.* Wills, 72 Pa. Superior Ct. 73; Com. *v.* Le Flem, 33 Pa. C. C. Reps. 460, 16 Dist. R. 13; Com. *v.* Mellert, 2 Woodward, 342; Com. *v.* Hoskins, 60 Pa. Superior Ct. 230; Com. *v.* Greer, 20 Pa. C. C. Reps. 535; Com. *v.* Signerski, 14 Dist. R. 361; Com. *v.* Hoffman, 29 Pa. C. C. Reps. 65; Com. *v.* Breth, 44 Pa. C. C. Reps. 56.

In some of the cases cited the courts used the expressions, "gross negligence," "culpable negligence," "recklessness," or the like. Even in these cases, however, we think that a careful consideration of the whole expression of the court justifies the conclusion that the thought of the court substantially is that the failure to use ordinary or reasonable care under the given circumstances is sufficient to constitute the crime of involuntary manslaughter where the negligent act results in the death of another. And we are of the opinion that this is the rule to be gathered from the common law as well as from the common and statutory law of Pennsylvania. It is true that in none of the cases referred to is this phase of the question as sharply presented as in the case at bar, and possibly none of the cases cited has passed distinctly upon this question. The rule as we have stated it, however, seems to be assumed as the basis of the declarations of the various courts in all of these cases.

In a quite recent case, tried in the Court of Quarter Sessions of Philadelphia County, the question which we are now considering was directly presented and passed upon. This is the case of Com. *v.* Hamilton, 3 D. & C. 364. At the time of the trial of the case at bar the decision in this case had not come to our attention. In that case Judge Gordon, in his opinion passing upon a motion for a new trial, said with reference to the rule given to the jury in his charge: "We charged the jury that they might convict the defendand if they believed beyond a reasonable doubt that the deceased came to his death as a result of the negligent operation of the truck. The defendant complains that the jury should have been told in substance that there could be no conviction unless they were satisfied that death was brought about by gross negligence on his part. The question of the degree of negligence requisite to sustain a conviction of involuntary manslaughter is not free from difficulty. The authorities outside of this State are not in accord, and no case has been called to our attention in which this question has been directly raised and decided in Pennsylvania."

After citing certain cases to which we have referred in this opinion, and quoting Blackstone's definition as above given, Judge Gordon said, among other things:

"We are of the opinion that, under the common law and the law of Pennsylvania to-day, no particular degree of negligence is necessary to make out the crime of involuntary manslaughter, where death ensues as the result thereof. . . .

"Here we do not find that any degree of negligence in particular is requisite for conviction of this offence. The language 'without due caution and circumspection' is general and is descriptive of ordinary negligence. In the

4 D. & C.

case of Com. v. Gable, 7 S. R. 423, the above quotation from Blackstone is cited and no reference is made to gross negligence. . . .

"In both of those cases simple negligence was held sufficient to sustain a conviction of involuntary manslaughter. This appears to us to be the better rule, and to be consonant with the fundamental idea underlying the offence. Gross negligence is requisite in cases of assault and battery in which the basis of the charge is a battery by negligence. The reason for this is that the common law offence of assault and battery involves the idea of an intentional battery, and the criminal intent is supplied only when the negligence is so gross and wanton as to give rise to the inference of malice. An assault and battery of this character, terminating in death, would sustain a conviction of murder in the second degree, for such negligence implies the malice essential to murder. Human life is not to be endangered by the negligent acts of others. The criminal law does not demand of the citizen a high or unusual degree of care. Ordinary care under the circumstances—the care which the average man of ordinary prudence exercises—is all that is required. This is not unduly exacting, and life is not to be destroyed by the negligent omission of such care. It is the duty of persons operating automobiles on the highway to be vigilant that their engines do not endanger the lives of others, and it is reasonable to require that ordinary care should be exercised by drivers and to hold them responsible for their failure to do so."

In the last cited case the rule is stated as we understood and undertook to define it upon the trial of the case at bar. As above stated, we are satisfied that it is a correct statement of the effect of the common law and the decisions of Pennsylvania. We think the conclusion thus reached is strengthened by the consideration of certain other cases involving the commission of crimes other than involuntary manslaughter. We call attention to a few of these cases:

Com. v. Coccodralli, 74 Pa. Superior Ct. 324. In this case the defendant was indicted for aggravated assault and battery and assault and battery, and was convicted of aggravated assault and battery. He had driven an auto-truck along the street in the City of Scranton and had run into another auto-truck, seriously injuring a young woman. Under the statute, in order to constitute aggravated assault and battery, it is requisite that the injury should have been inflicted unlawfully and maliciously. Upon appeal, the defendant in this case contended that the evidence did not warrant a finding that the injury was unlawfully and maliciously inflicted. The Superior Court said, among other things: "The evidence was such as to warrant a finding that the defendant had driven his auto-truck along a street of the city at a rate of speed and in a manner which manifestly and necessarily imperiled the lives and limbs of other persons lawfully using the street. It is true that there was nothing to indicate that the defendant was actuated by express malice towards the young girl or that he had a conscious intention to injure her, but the circumstances under which the injury was inflicted were such, if the jury found the facts to be as testified to by the witnesses for the Commonwealth, as to give rise to a legal implication of malice. 'The excessive rate of speed at which an automobile is driven is a product of the will of its driver and not the result of mere inattention or negligence. The two cannot be confused, any more than the hurling of a baseball bat into a crowd of spectators can be confused with the accidental slipping of the bat from the hands of the batter. A blow inflicted by a wilful act applies to a much more dangerous agency, since it cannot be that what would be a crime if done with a plaything weighing a few ounces ceases to be a crime if committed with an instrument

weighing thousands of pounds, driven by many horse-power of force. There is, therefore, no legal reason why the crime of assault and battery may not be committed by driving an automobile on a public highway at a rate of speed that endangers the safety of others and actually results in such injury:' State v. Schutte, 87 N. J. L. 15. One who wilfully drives an automobile on the public streets at a rate of speed or in a manner which involves a reckless disregard for the safety of other persons lawfully using the streets, and by so doing causes the death of another, is guilty of felonious homicide: State v. Campbell, 82 Conn. 671. These decisions involved no new departure in the criminal law. They merely applied well-recognized and long-established principles to the conditions arising out of the introduction of high-powered vehicles, capable of great speed, upon public highways, which all persons have a right to use. The same principles were recognized and applied by the Supreme Court of Pennsylvania, in 1882, in a case in which the defendant, intending no harm, wounded another by discharging a pistol in a Pullman parlor car, and it was held that the law implied malice from the character of the act: Smith v. Com., 100 Pa. 324. It is an unlawful act to so use the public highways as to involve a manifest danger to the lives of other persons lawfully using them, and those guilty of such action must at their peril abide the event of their actions, if injury to others results, although no mischief was intended. 'It is said that if a person happens to occasion the death of another, inadvisedly doing an idle, wanton action, which cannot but be attended with the manifest danger of some other, as by riding a horse, known to be used to kick, among a multitude of people, by which he means no more than to divert himself by putting them into a fright, he is guilty of murder:' First Hawkins Pleas of the Crown, ch. 31."

The effect of this decision seems to us to be that where the conduct of one inflicting injury upon another is such as to indicate a wanton or reckless disregard for the safety of others, or, as it is sometimes stated, gross negligence, there arises an implication of legal malice. In this case such an implication was necessary to sustain the conviction of aggravated assault and battery. Had the accident resulted in the death of its victim, it seems to us that the logical effect of the decision is that the circumstances would have justified a conviction of murder in the second degree.

Smith v. Com., 100 Pa. 324. In this case the facts as found by a special verdict of the jury were as follows:

" 'That the defendant, on the 27th day of September, 1881, in the County of Philadelphia, was a passenger in a car, which was filled almost exclusively with delegates and others who had been attending the State convention that had been held at Williamsport; that the defendant, immediately before the train was stopped at the depot in the City of Philadelphia, discharged a pistol, loaded with ball cartridge, downward and backward and by his side, intending to shoot the said cartridge into the car, and that the ball therefrom entered the foot of Samuel Josephs, inflicting a severe wound; that defendant had previously, while on the train and in the said car, discharged the said pistol in like manner for the purpose of causing a temporary fright amongst its inmates, and then dissipating the same by explaining that the discharge did not come from a seeming pistol, which he had been, at the time of the discharge of the real pistol, flourishing and pointing recklessly—the seeming pistol being, in reality, a case containing cigarettes; that at the time of the discharge, when the ball struck the prosecutor, the pistol, then discharged, was by the defendant held downward, and was discharged with the intent to shoot into the floor, and not with the intent to injure the prosecutor or any

4 D. & C.

other person. When the said discharge took place, the defendant stood in the aisle of the Pullman parlor car, and the prosecutor and other persons stood behind him and in close proximity to him.

" 'That the pistol was fired in a spirit of frolic and not with the expectation or intent, on the part of defendant, to injure any person whatever.' "

Under this state of facts, it was held that the defendant was properly convicted of aggravated assault and battery. The court said, among other things:

"The facts established by the special verdict clearly justified the judgment that was pronounced thereon. This is so conclusively shown in the opinion of the learned judge before whom the case was tried that nothing more need be said on that subject. The act of discharging the pistol, under the circumstances found by the jury, was undoubtedly unlawful and well calculated to inflict serious personal injury. It was recklessly and wilfully done, without the slightest justification or excuse. From such facts as these the law will imply malice.

"In a case somewhat analogous in principle to the one before us, it was said in reference to the prisoner: 'He acted unlawfully and maliciously; not that he had any personal malice against the individuals injured, but in the sense of doing an unlawful act calculated to injure, and by which others were in fact injured. Just as in the case of a man who fires a gun among a crowd, it is murder if one of the crowd be thereby killed:' Queen v. Martin, Law Rep., 8 Q. B. Div. 54." See, also, Com. v. Gayton, 69 Pa. Superior Ct. 513; Com. v. Micuso, 273 Pa. 474.

The rule which we have stated, as suggested by these cases last referred to, seems to have been adopted by Trickett in his Pennsylvania Criminal Law, vol. 2, page 887, where he says: "Involuntary manslaughter may result from doing some act which, though unlawful, is not a felony, 'as if two persons play at sword and buckler, unless by the king's command (and, hence, unlawfully), and one of them kills the other.' Here the play is intentional, but the death is neither foreseen nor intended. The death may result from an act which, in its chief elements and aims, is legitimate, but which is done negligently, and yet not so negligently that the carelessness may be deemed malice, in which case the killing would be murder."

In effect, therefore, our conclusion is that where circumstances of wantonness, recklessness or gross negligence are such as to indicate a disregard of the safety of others, the law draws the inference that the accused is moved by legal malice, and that his crime, where his act results in death, is not involuntary manslaughter, but murder, at least of the second degree. Malice is not an ingredient of the crime of involuntary manslaughter. Its presence raises the degree of the crime above that of involuntary manslaughter. This seems to us also to be the effect of the common law definition of murder and involuntary manslaughter, and of the common law decisions recognizing and applying that definition. It seems, therefore, to us inconsistent and illogical to require proof of this element of gross negligence, wantonness or recklessness to establish the offence of involuntary manslaughter where the presence of such circumstances generally, by giving rise to the presumption of legal malice, raises the degree of the crime to murder. Involuntary manslaughter does not involve the intent, express or implied, to bring about the death of another, or to inflict personal injury upon another. To do the unlawful or negligent act thus resulting, consciously and knowingly, is sufficient, so far as the mental attitude of the offender is concerned. In the case of this crime criminal responsibility is furthest removed from the conception of moral turpitude or culpability in the actor.

Commonwealth v. Mamula.

As above stated, counsel for the defendant has called our attention to many decisions in other jurisdictions in which it is held, or at least seems to be held, that, in order to constitute the crime of involuntary manslaughter where death results from the negligent act of the defendant, the negligence must amount to recklessness, or wantonness, or to what these courts sometimes refer to as gross, or culpable, or criminal negligence. We have examined these citations made by counsel for the defendant. Some of the cases cited, when carefully examined, do not seem to us to support the defendant's contention. Others may be distinguished from our cases by the fact that in their respective jurisdictions statutory provisions specifically define various grades of homicide otherwise than they are defined in Pennsylvania or at common law. In still other cases it seems that the courts are seeking to find as an element of the crime of involuntary manslaughter a criminal intent, or moral wrongdoing going beyond the fact of negligence. This tendency seems to be illustrated in the case of State v. Campbell, 82 Conn. 671; 74 Atl. Repr. 927, and also in the case of State v. Goetz, 76 Atl. Repr. 1000. Cases decided in several other jurisdictions and cited by counsel for the defendant are of like effect. It seems to us that these cases are going beyond the common law conception of involuntary manslaughter, as well as that of the common law of Pennsylvania. It seems clear that in quite a number of them a rule is established different from that which we have assumed to be the rule in Pennsylvania. We do not feel called upon, however, to further consider or analyze these cases.

We are satisfied, for the reasons above stated, that the rule of law in Pennsylvania is as we have defined it, and that these cases, in so far as they state a different rule, are not to be followed by us. The rule which we have stated seems to us not only to be most consistent with the principles of common law, but also to be the most reasonable and practical rule for the administration of justice in such cases. To attempt to apply the refined rules as to slight, ordinary and gross negligence in such cases would, it seems to us, introduce confusion and uncertainty into the criminal law.

The difficulty of applying these distinctions in practice is confessed by eminent legal authorities.' Thus, Thompson, in his work on Negligence, vol. 1, § 18, says: "I confess myself careless, ignorant and indifferent upon this whole subject of the degrees of negligence. It is plain that such refinements can have no useful place in the practical administration of justice. Negligence cannot be divided into three compartments by mathematical lines. Ordinary jurors, before whom, except in cases of admiralty, actions grounded on negligence are always tried, are quite incapable of understanding such refinements. . . . The sound view is that the classification of negligence as gross, ordinary and slight indicates only that, under special circumstances, great care and caution are required, or only ordinary care, or only slight care. If the care demanded is not exercised, the case is one of negligence, and a legal liability is made out when the failure is shown."

In commenting upon this passage in the case of Cody v. Venzie, 263 Pa. 541, Justice Simpson holds that the degrees of negligence referred to are recognized by the law of Pennsylvania. He apparently appreciates the difficulty arising in the presentation of these distinctions to a jury. After quoting the above written passage from Thompson, he says: "Whether there are three or more or less kinds or degrees of negligence, however, and whether there is a distinction between 'kinds' and 'degrees,' as Thompson suggests (Ibid., § 21), is wholly beside the question we are now considering. It must be admitted that the term 'slight negligence' is inadequate to express the different kinds of negligence often grouped thereunder, as witness the cases of an ordinary

4 D. & C.

bailment for the benefit of the bailee, of a common carriage of passengers for hire, and of a common carriage of goods for hire, for each of which a different standard exists. Nor would the difficulty be much lessened if the term were sub-divided into 'slight negligence,' 'slighter negligence' and 'slightest negligence,' for no one would know what 'slighter negligence' meant, unless some other negligence, regarding which it was 'slighter,' was first defined or explained. A translation of those expressions into terms of care would not remove the difficulty, for if 'great care,' 'greater care' and 'greatest care' were used, some other kind of care would have to be defined or explained before 'greater care' could be understood. But, after all, the essential fact remains, there are kinds or degrees of negligence and care which in ordinary parlance may be conveniently used, however difficult it may be, owing to the inadequacy of the English language, to phrase some of them for practical use with juries."

Writing of the same subject, O. W. Holmes, now Justice Holmes, of the Supreme Court of the United States, in his work, "The Common Law" (page 120), says: "Consider the judgment in Coggs v. Bernard, the treatises of Sir William Jones and Story, and the chapter of Kent upon the subject. They are so many attempts to state the duty of the bailee specifically, according to the nature of the bailment and of the object bailed. Those attempts, to be sure, were not successful, partly because they were attempts to engraft upon the native stock a branch of the Roman law which was too large to survive the process, but more specially because the distinctions attempted were purely qualitative, and were, therefore, useless when dealing with a jury. To instruct a jury that they must find the defendant guilty of gross negligence before he can be charged is open to the reproach that for such a body the word 'gross' is only a vituperative epithet."

It is to be observed that in the case of Cody v. Venzie, above noted, and the leading case of Coggs v. Bernard, the courts were applying the law of negligence to the obligations arising from the contract of bailment. The degrees of negligence involved were classified and defined according to the various forms of such contracts. Liability for negligence arises only where there is a pre-existing duty of care. Where, as in contractual relations, such as bailment, the duty shifts according to the nature of the contractual relation, the degree of negligence required to create liability may well shift also. When we eliminate such situations as are created by contract, and regard the question of negligence generally and independently of its application to contractual relations, the duty imposed upon men generally is that of ordinary care, and the negligence condemned is ordinary negligence. Thus, Bigelow says: "A owes B the duty to forbear to inflict damage upon him by acts or omissions not in conformity with the conduct of a prudent or careful or diligent man, though damage be not intended. . . . It is declared by all the authorities that the standard by which to determine whether a person has been guilty of negligence is the conduct of the prudent, careful, diligent or skillful man in the particular situation:" Elements of the Law of Torts, 285-287. To act contrary to this duty of ordinary care, to be guilty of ordinary negligence, is to do an unlawful thing, or at least to do a lawful thing in an unlawful way. It constitutes such unlawful conduct on the part of the actor, that when his act, thus tainted with illegality, becomes the cause of the death of another, we think the act is brought within the definition of involuntary manslaughter as accepted at common law and in Pennsylvania.

The rule thus reached is not only practical, in the sense of being workable in jury trials, it is also practically and reasonably just. As Judge Gordon said in the case of Com. v. Hamilton, above quoted: "This is not unduly

Commonwealth *v.* Mamula.

exacting, and life is not to be destroyed by the negligent omission of such care. It is the duty of persons operating automobiles on the highway to be vigilant that their engines do not endanger the lives of others, and it is reasonable to require that ordinary care should be exercised by drivers and to hold them responsible for their failure to do so."

Now, Sept. 15, 1923, the motion for a new trial is overruled and a new trial refused.

From F. H. Laird, Beaver, Pa.